Good morning, Your Honors. John Lundin for Defendant Appellant Christian Avelar-Ceja. Your Honors, in United States v. Rodriguez, this Court stated, We must not accept what has come to appear to be a prefabricated or recycled profile of suspicious behavior, very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch. The opinions of this Court have put the nomenclature of reasonable suspicion into the public domain. We must not allow ourselves to be seduced by the familiar by the reassuring familiarity of its echo. And that's precisely what occurred here. The factors relied upon by the district court were a prefabricated profile designed by the Border Patrol to create Well, I've never seen, I've seen a lot of Border Patrol cases which we might have thought were similar facts, maybe because they are similar facts, but this is the first one in which I've ever seen a double U-turn. We've said that even a single U-turn may, with other circumstances, be enough for reasonable suspicion. But this is a double U-turn plus going off on a side road, so you don't have to get to the Border Patrol, and then on the side road showing that it's heavily burdened, heavily loaded with something. Do you know of any other W-turn case? No, Your Honor. And actually, the double So it's not just that they've given you a pattern of, that they use in every case. This is different from the other ones we've seen.  And actually, the double U-turn And also, they're right on top of the border checkpoint here. That's true. But where I was going with that is we can infer what's really going on here, first of all from the fact that this agent had apprehended, or had stopped, rather, two vehicles containing innocent motorists within 40 minutes of arresting Mr. Avalar for making the same right turn onto Frink Road in front of the checkpoint, and the district court concluded that that was not relevant. Well, I mean, essentially you're implying he was lying about the U-turns, because these other things, the other people didn't make the U-turns, right? As far as we know. We don't know, because the district court All right, but it wasn't because of making the right turn onto the Frink Road. It was because of these, at least the additional factor, other than going onto this road, the U-turns. And maybe the officer was lying, but that's not the finding, and that's not what we're dealing with here. So beyond that, how is this similar to the other circumstances? Well, again, the agent testified that the U-turns were part of what figured into his reasonable suspicion calculus. Every other factor that he stated was identical to other ones that appear before this Court, and he also It's like an Aravisu thing. We said what you'd like us to say, and it didn't take very long for the Supreme Court to reverse us. Well, the thing about We may have been right the first time, but it's no longer the law. Well, you're honest. The thing about the two U-turns is it's actually less suspicious when you think about it. It's more consistent with someone being lost and looking for the landfill or going to the mineral spa than it is someone who's engaging in illegal activity, because he turns around and goes the opposite way of the checkpoint, and then turns around and goes right back to it. Because at that point it was being followed, right? Well, but there was no testimony that he did anything in terms of evasive maneuvering per se, that he drove faster than he should have been driving. And who in their right mind would turn around and drive right back toward the checkpoint and make a second U-turn? Because when he went to the checkpoint, he didn't go to the checkpoint. He went off to the side. But that's what the Border Patrol is. So if he actually is cognizant that there's a Border Patrol agent following him, why would he turn around and drive right back into the teeth of the Border Patrol station? It's more consistent with someone being lost. I'm feeling a bad situation. Well, it's more consistent with someone being lost. And again, that really didn't impact the Border Patrol agent's opinion in this case. He was specifically asked by the prosecutor, Sir, did you form an opinion as to why the car exited onto Frank Road? Answer, to circumvent the checkpoint. Question, and why did you feel that way? Answer, well, I, because he didn't go to the checkpoint. That was ER-71. That was the agent's answer. This is a question from Naifa Table. Was this checkpoint permanently there or temporarily there? It's a permanent checkpoint. And, again, what's really going on here is the Border Patrol wants to stop every vehicle  And my investigator and I were specifically told that by a different Border Patrol agent working the same checkpoint. And the district court held that that was irrelevant to its analysis. Well, it is irrelevant in the sense that we're sort of beyond the point of worrying about their motives. So the question is the objective. Right. But if every vehicle that makes that turn, it calls into question the agent's Veracity. Veracity is what it calls into question. But that's not where we are. He said he'd like to stop every vehicle that comes through. If they had the manpower to do so. And here we have the arresting agent in this case pulling over a Ford pickup three minutes before he pulls over Mr. Avalar because it appeared to be heavily laden going over the railroad tracks. And that was an innocent motorist who was detained for no reason. And the only difference or at least the only difference that we're aware of is the U-turns. But with respect to the U-turn issue as well, I believe it was in the I believe actually Judge Reinhardt, it was one of your opinions. Yes. That's the one I mentioned where Montero Camargo. Montero Camargo. In which we said even one U-turn could be suspicious if there are other circumstances. Right. But what happened in Montero Camargo, Your Honor, respectfully, is that the U-turn was made and the person went in the opposite direction, never came back to the checkpoint. And the agent testified in that case that U-turns near other checkpoints were not as significant because near other checkpoints there were legitimate turnoffs and other reasons that people could be making U-turns because they might be lost. This was a different checkpoint. This was a Highway 86 checkpoint in Montero Camargo. The checkpoint here was the 111 checkpoint. And there was a landfill, a golf course, a resort area, multiple RVs and trailer parks all in this area. With respect to, I want to touch on the Garcia Baron case, which was a case that occurred in the same area. And in that case, the Ninth Circuit held that, actually the district court held that it was a close call. And the Ninth Circuit said that the district court was right. It was a close call. And that case was much worse for the appellant. It was at 3 a.m. that he made the same turn onto Frank Road. And the Border Patrol agent in that case, instead of immediately pulling him over, followed him past almost all of the legitimate turnoffs to where legitimate traffic would be going before he affected the stop. That's not what happened here. Also, there was testimony in Garcia Baron that there had been an unusually high amount of alien smuggling traffic that had occurred in the week leading up to the stop. We had the opposite of that here. Certainly, if there had been additional alien smuggling arrests that occurred in this region by any of these Border Patrol officers at the checkpoint, we would have heard about that. We didn't. In fact, we get the opposite of that. We get this agent pulling over innocent motives. That's the only information that actually should have come out and been fleshed out before the district court, but I wasn't permitted to get into it. I see I have about a minute and a half left. And if I can say that for rebuttal. Go ahead. Thank you. Good morning, Your Honors. Steven DeSalvo on behalf of the Pele United States. This case is governed by the two precedents that were cited by the United States in its brief, Garcia Baron, which is a checkpoint case, or rather a case where the defendant attempted to evade the checkpoint, and also the Montero Camargo case, which is a U-turn case. In this case, we have not only evasion of a checkpoint, but we have two U-turns, and I believe that the combination of these factors, the two U-turns and the evasion of the checkpoint by exiting at Frink Road, which is a common means to avoid the checkpoint on Highway 111, those factors establish that there was evasive driving in this case, plus the other factors considered by the district court, the fact that the truck appeared to bounce when it went over railroad tracks, and the fact that pickup trucks are commonly used to smuggle aliens, and the fact that it did not appear to be going to a construction site. These factors should support the reasonable suspicion in this case. I would like to point out in particular to a contention made by the defendant about the possibility that he was lost. I want to point the court to the record in this case. Agent Bruce McKenzie, who was the witness for the United States, specifically testified that there were no roads intersecting Highway 111 before Frink Road in that area. And so the defendant would like you to believe that he might have missed an exit and then turned around to try to find the other exit, but there are no roads intersecting that area. And I would point out that this was actually a factor that was cited by the court in Montero Camargo. The court, in finding that the U-turn was suspicious, specifically cited the fact that it was unlikely the defendant had missed a turnoff because there were no turnoffs. Excuse me, there were no public roads, and the only roads in the area were private roads. I'd also point out that it was the ---- But what about the fact that the second U-turn was back in the direction of the checkpoint? That doesn't seem like a very ---- something somebody would do was trying to avoid the checkpoint. Well, I think that the ---- you can infer that it was always the defendant's intention to go to Frink Road. The evidence in this case is that you had a curving highway, and I'm indicating to you the way it was curving. It was curving sort of in a counterclockwise direction. And then you had Frank Road intersecting it on this curve so that as the driver ---- here was the border patrol agent in his vehicle, and as the defendant was driving up towards the checkpoint, he could see ---- you can infer that he must have seen the border patrol agent on Frank Road. In fact, I point the court to Exhibit 11 in this case, which is a photograph taken from the location where the first turnaround occurred. And in that photograph, there is a border patrol vehicle, and the agent testified that he was not quite there, but he was a little further back towards a larger antenna. My point is, is that as the defendant was driving up on Frank Road, he would have seen border patrol agent McKenzie on Frank Road. And since that wasn't his intended destination, that's why he turned around. He then went back. When he realized the agent was following him and was no longer on Frank Road, he turned around and tried to go back to Frank Road. In fact, that's what he did, and he did exit Frank Road. Is the theory that somewhere on Frank Road you dump the people? No. The theory is that you get on Frank Road, and then you continue. It's sort of a horseshoe loop around the checkpoint, so that if you exit Frank Road, it travels for a distance northward past the checkpoint and then rejoins Highway 11. So that's a way to avoid the checkpoint. Yes. So it's a loop around the checkpoint. And I would point out that the case of Garcia Barone, it specifically involved Frank Road, and that was a case where the court had noted that there was a high level of evasive activities on this loop. Now, that was a 1997 case. Is there anything on this Frank Road? Pardon? Is there anything on Frank Road? There is two spas. They cater mostly to elderly people who drive RVs or recreational vehicles or campers. There are sometimes pickup trucks. That was the testimony of the defense witness. But for the most part, they're elderly people, which did not fit the profile of the driver in this case. I would also point out that it was not only undisputed that the Border Patrol agent would have been in his line of sight. There was a golf course, wasn't there? Yes. There was also a golf course. A golf course for elderly people? No. I'm sure it's open to anybody of any – persons of any age. And the golf course was directly adjacent to a construction site. The testimony in the record was that the construction site – that the trucks going to the construction site tended to do that in the morning. This was a late afternoon stop around 3.15 p.m., and the agent testified he'd never seen pickup trucks heading to the construction area that late in the afternoon. As for the golf course issue, I don't think there was really any specific testimony on that point. One way or the other. But I think it's – this is one of those cases where, as the Supreme Court noted, the factual mosaic is one where you have to look at the totality of the circumstances. And while Garcia-Barón, which is the avoiding-the-checkpoint case, and Montero-Camargo, which is the U-turn case, while the facts are not exactly analogous, we have a situation where you have evasive driving with the exit on Frink Road, with the prior two U-turns, plus the other factors that were noted by the district court. And the United States does not believe that this is one of those cases where, you know, we have – where we have vague, conclusory, prefabricated profiles or factors. Kagan. Why if the Border Patrol did stop everybody on Frink Road? Frink Road. Frink Road. Would that be adequate for reasonable suspicion, just being on Frink Road? No. Well, at a pickup truck, let's say. Being on Frink Road. I'm not here to defend, you know, to state that Frink Road is – that stopping anybody on Frink Road would be legal. But I think the Court should recognize that this is a common route for avoiding the checkpoint, so that if – so if an officer sees behavior that appears to be evasive and is otherwise suspicious, in addition to the exiting on Frink Road, then that should support a stop. But simply stopping somebody because they exited Frink Road would not be – would not be legal. But we need not concern ourselves with that possibility, because the facts in this case are more than sufficient to support finding reasonable suspicion. Thank you, Your Honor. Thank you, Your Honor. Your Honors, a couple of quick points. First of all, in the general sense, I think it is significant that the district court described Agent McKenzie's testimony as undisputed. He credited his very, very long experience with the Border Patrol in coming up with opinions as to what constitutes reasonable suspicion. But he refused to consider any evidence that detracted or impeached that opinion. How can that be – how can the court simply disregard evidence that this same agent stopped two vehicles containing innocent motorists, one of which – at least one of which was virtually identical, a pickup of a camper shell, the same brand of pickup, within three minutes, that appeared to be heavily laden, going over the railroad tracks? How can that be? And there's also another destination here that we've forgotten to mention, which is there's a landfill. And there's also a construction project. And the construction project was for cementing a canal. It's in the excerpt of record that that was what was going on at this construction project. So there's going to be trucks carrying cement going back and forth. This vehicle is completely consistent with the innocent one that had been stopped three minutes before. With respect to the U-turn, the government attorney just said it exactly right. We can infer that it was always his intention to go to Frank Road. Those are the government attorney's exact words, and that's exactly right. That is completely consistent with someone who's lost, who's looking for Frank Road because they're going to the construction project or to the landfill, and they think they've missed it. They think they've gone too far. And there's absolutely no evidence that Mr. Avalar was aware that he was being followed. He made basically a lazy U-turn, went one direction, then made another lazy U-turn and went back. He wasn't speeding. He wasn't maneuvering. And so those factors are completely consistent with someone who's looking to dump off trash or go to the construction project or go visit Grandma. Unfortunately, that was exactly what the Supreme Court said we couldn't do in Arrow v. Zoo, is to look at each factor, find each one is consistent with innocence. Well, it's certainly a totality test, Your Honor. I agree. And they say it doesn't matter whether they're all consistent with innocence. You put them all together, and it's suspicious. Well, and, Your Honor, I think that you put all these factors together, and we have what's really suspicious is the Border Patrol agent's testimony that he found this suspicious based on his prior conduct and based on what another Border Patrol agent. But that's why I keep saying what you're really doing is challenging his veracity. Well, I tried to in the district court. I understand that. And this just isn't the place to do it. Well, perhaps a remand for additional factual findings would be appropriate, but it should have been permitted to get into that before the district court. And I say that respectfully. Finally, with respect to Garcia-Baron, and I'm sorry, just briefly, this court held in Garcia-Baron that on those facts that the district court was not clearly erroneous in finding that reasonable suspicion existed, given, number one, the time of the stop, which was 3 a.m., and also, number two, the fact that the driver in that case went past the legitimate destinations, the spas, he went by them before he was stopped. Those are very important factors that are not present here. And so, again, under a totality of the circumstances, the behavior here, there was no articulable suspicion. We are we've been given its familiar and reassuring echo. Thank you. Thank you, counsel. The case just argued will be submitted. The next case for oral argument is United States v. Lopez-Figueroa. Submitted. The next case for oral argument is Luna v. Almagar.
judges: Reinhardt, Berzon, Miner